Before we begin today, I just want to say on behalf of the Court and of this panel, I'd like to welcome Judge Guilford to our Court. He's sitting by designation from his normal home in the Central District of California, and we're very pleased that he could join us today. We have three cases for argument today. We'll turn first to Cornell University v. Hewlett-Packard, 2009, 1335. Mr. Alcock. Thank you, Your Honor. Good afternoon. May it please the Court. I'm going to spend five minutes on my opening time and then ten minutes on reply and also with respect to responding to the cross-appeal. With respect to the appeal, the error below was prompted by extrinsic evidence. With respect to claim construction, the error was prompted by a reliance on extrinsic evidence contrary to the specification. With respect to the first issue, is it contention that it was wrong as a matter of law for the District Court, given that the term was ambiguous, to then turn to persons skilled in the art to determine what the meaning of the term was? No, that isn't the contention. The contention is that both parties agreed that the term did not have a plain and ordinary meaning. Both parties agreed that the term must be drawn from the specification. HP's definition from the specification was the full definition from the specification. Cornell's definition from the specification was a cherry-picked one that only included one of the structures in the specification. The only way the District Court got to accepting that construction was through the consideration of extrinsic evidence that contradicted the specifications requirement that the dispatch stack, quote, requires the termination of Alpha S1, Alpha S2, and Beta D for each instruction required. So to finally answer your question, Your Honor, it isn't merely the reliance on extrinsic evidence. It's the reliance on extrinsic evidence that contradicted the specification in the context of a definition where both parties agreed that it wasn't a plain and ordinary meaning situation, that the definition had to be drawn from the specification. Cornell's definition from day one was drawn from the specification. Well, certainly there was a reliance or a reference to Persons Guild of the Art and the testimony of Dr. Smith and so forth, but there was also a reliance on the principle of claim differentiation. There was also a reference to one of the prior articles cited and its reference to register renaming. So it wasn't exclusively extrinsic evidence. Am I right about that? Nothing is exclusive, no. But the primary reliance was on extrinsic evidence, and, Your Honor, claim differentiation doesn't help Cornell here because the dependent claims included Alpha S1, the term they want to be included in the main definition. So if you would apply claim differentiation, then the term dispatch stack would have no content and you would only get the subsidiary elements from reference to the dependent claims. They picked one to avoid the prior art and get to infringement. I wanted to follow up on that last question. On page 7 of your response and reply brief, you say, Cornell also concedes that register renaming is not disclosed in the 115 patent, and you cite pages 10 and 22 of their brief. I do see that on page 10 of their brief, they do cite numerous articles that I think do cover register renaming. So you would agree that at least one of the sites in the article includes register renaming? There's one site in the file history. It's not disclosed anywhere in the specification. But I thought the article was referenced in the patent, no? The register renaming is not disclosed in the specification. One of the articles referenced in the file history discloses register renaming. I better get on to the written description requirement, which I think is particularly important here after the Erriard decision. Particularly after Erriard, the law is clear that a written description requirement separate from enablement and that it must be satisfied by an objective inquiry into the four corners of the specification. And the possession requirement is, I think now, quite clear. The district court unquestionably found it necessary to rely on register renaming in order to satisfy the written description requirement. And the quote is, accordingly for purposes of the written description requirement, and I'm quoting from the JMOL now, it is sufficient that one of ordinary skill at the time of the invention would have recognized register renaming as a prior art technique for eliminating non-essential dependencies. Earlier on in that very decision, the JMOL lays out in detail, more details about register renaming and what was considered by the district court in connection with register renaming. So it's quite clear that the district court relied on one of skill in the art, the content supplied by the knowledge of one's skill in the art, with respect to register renaming, in order to conclude that the patent satisfied the written description requirement. And that's improper. It was improper before Eriod, and it certainly is improper after Eriod. So I see I've taken up all of my five minutes. It's quite short. We'll see you again. You will see me again. Thank you. Good afternoon, Your Honors. May it please the Court. Ed Pomlosky for Cornell. Your Honors, this was a very complex case, both in terms of the invention and the technology. In the district court, in construing the term dispatch stack. Well, actually, counsel, the term that needed to be construed was means for detecting first, right? In some of the claims, the means plus function language claims, correct? The means plus function language was in two of the asserted claims. But that's what's before us. Okay, so we're trying to figure out how we define a means for detecting. And as I understand the lower court opinion, they identified the dispatch stack as the means for detecting in the specification. And, of course, 112.6 requires them to look to the spec, right? Yes, it does, Your Honor. Now, so 112.6 requires them to look at the dispatch stack disclosed in the spec. And I can't find any dispatch stack disclosed in the specification that does not require an examination for beta dependencies. So how is it that we could have a claim construction under 112.6 that chooses a structure other than what is disclosed in the spec? Let me take those up in order, Your Honor. First of all, there are two categories of independent claims in this case. But I want to start with the means plus function language. I understand. Your Honor, the district court construed the specification to mean that the dispatch stack was entitled to a flexible interpretation. Show me a structure in the specification that discloses a dispatch stack that doesn't require examination for beta dependencies. There is no precise structure, Your Honor. Now, doesn't 112.6 require you to accept the structure in the spec? No, it does not, Your Honor. Oh. Let me explain. For example, this Court's decision in the Assess case indicates that as far as correspondence construction goes, we do not incorporate any structure beyond that necessary to carry out the recited function. The recited function as construed by the court, the trial court, and not challenged by HP, is detecting whether the instructions are free of data dependencies, whatever they may be. The undisputed evidence is that there's only one kind of data dependency that is an essential property of the instruction. That's an essential dependency. Non-essential dependencies arise from storage conflicts. That's not subject to any disputed testimony, Your Honor. I don't see... I'm having trouble understanding your argument, so maybe you better say it again so I can appreciate it. Yes, Your Honor. May I take the Court through the package? Always a good move. Go for it. Okay. Now, in Column 3 of the package, which I think is somewhere around 776, a dispatch stack is introduced. And that dispatch stack is simply a conventional instruction stack with reference to Figure 2a and 2b. All it has is it's a container that has instructions in it. And then we go on, and the patent explains that there's a problem here, and that problem is how to deal with data dependencies among instructions. That's talked about in Column 4. And then commencing in Line 45 of Column 4, and then into Column 5, the patent says that our invention is going to depart significantly from such known systems by providing the dispatch stack with a certain kind of dependency detection technique, Your Honor. Now, where is this certain kind? Tell me what line. That is then explained, Your Honor. Column what line, Your Honor? Starting on Line 55, Column 4, and then going on into Column 5 and Column 6. So what the patent next does, Your Honor, is it sets up an environment. Does it somewhere say here that it is only applying to alpha dependencies? I don't see it. I don't see what you're referring to. I mean, even on Column 5, Line 5, it explains OP, S1, alpha S1, S2, alpha S2, D, and beta dependencies. Your Honor, the reading of the patent, which is not disputed by their own experts, Dr. Worley, for example, All of that is extrinsic evidence. My job is to go through the claims, and this is a matter of claim construction. Is that the standard we use? That you can come up with some structure which is not clearly identified because as long as it doesn't contradict what's in the patent already listed in the spec, where is that testified? Your Honor, it is the law that a contextual analysis is to apply here in constructing the claims. The patent says that we have two generalizations about data dependencies, and those are the words that are used. We can have essential dependencies and non-essential dependencies. Does the patent refer to essential and non-essential dependencies? Not in so many words. That is from Dr. H.P.'s expertise. Right, but what is it? Can you point to anything in the specification that deals with this? I mean, your whole argument on claim construction rests on this essential  And I didn't see any reference to that in the specification. Your Honor, the definition of an essential dependency is contained in Column 4, Line 65 of the patent. That's one of the generalizations. Consequently, it can be generalized and then structured. Is that what you're referring to? Correct. And then you go on, and in Column 5, it talks about non-essential data dependencies beginning on Line 6. Consequently, it may be also generalized. And how are we supposed to glean from the consequently it may be generalized and consequently it may also be generalized that some of these have to be done and the others don't? How do you glean that from those two sentences? The district court, over a three-day evidentiary hearing, took testimony to gain an understanding of the underlying technology and the patents. Both sides' experts concurred that there were two different kinds of data dependencies, one an essential and one a non-essential, and that the only kind of data dependency that was an inherent property of computer instructions is an essential one. Both sides also concurred that the sequence of instructions in this patent and the format, OPS1S2D, that you see in Chart 1 are samples. That's right, for example, from Dr. Worley's testimony at 5799 through 5819 in the record. My difficulty is, how did you choose alpha? Why didn't you just choose beta? You're going to pick only one, and specification requires both. What made you choose alpha? Understood. Alpha is nomenclature, Your Honor. It's representative of an essential data dependency. Since the instructions define a format that had an S1 and S2, you had to have two alpha fields with logic. I don't know. It seems to me that this entire patent is about detecting dependencies, and the patent nowhere in it says we're only going to offer a product for detecting essential dependencies. And I'm just having a lot of trouble finding any language in this entire specification that supports that. I do agree. You've got extrinsic evidence, plenty of it, that says that. But I'm not finding anything in the patent, and that's my difficulty. Your Honor. I'm laying it out for you so you have a chance to show me where I'm wrong. The patent is a technique for determining whether there are data dependencies in instructions, whatever they may be. The computing environment is a representative environment. There's nothing in the patent that says that the one and only one kind of dispatch stack is one that detects both kinds of data dependencies. There's no disclaimer whatsoever in the patent. Well, but at least as far as 112.6 goes, the statute actually tells us we have to choose the structure disclosed in the spec, and you've already acknowledged that the only dispatch stack disclosed in the spec does disclose both alpha and beta dependencies. It does, Your Honor. It does, Your Honor. And so I don't see for 112.6 how we can ignore that. Your Honor, the question comes down to what is the structure that's necessary versus beyond that necessary to carry out the recited detection. Your Honor, if I may, I'd like to turn a moment to damages unless the Court has any other questions. Okay. Now, in this case, there was no dispute that the jury instructions were a correct statement of law, consistent with Lucent and decisions, for example, of this Court's predecessor court, Marconi. The jury was told that it could balance rate and base in arriving at a damages award that indicated the value of the invention that was captured in the infringement. Well, let me just ask you a technical question on that. Did anyone ever argue to the jury that the royalty rate and the royalty base were linked? Your Honor, in fact, yes, because there was evidence of this on multiple counts. For example, HP's own expert, Dr. Wallace, testified that he came up with a damages award of $7.7 million as followed. He took the $23 billion CPU module as a royalty base, and those are real-world transactions, 700,000 instances where customers selected and purchased a CPU module. Then what he did is he took Mr. Ostendorf's 8% royalty rate multiplied by a so-called cost adjustment factor and came up with $7.7 million. The jury could readily have looked at that and said, you know what, the only reliable base here is the CPU module. We're going to carve back a lot on Cornell's 2.5% rate. We understand Mr. Wallace's testimony, so we carve it back to a tenth of the rate that Dr. Wallace used. That's also consistent with Mr. Ostendorf's testimony where he says that you could get a 1% royalty rate on an important patent, and there's no question this is an important patent. HP's documents time and time again call the IRB, and that's where the invention is, the critical path, the central control logic, et cetera. Can I ask what exactly is it you would like us to reverse in damages, the exact holding, and what would our standard of review be for that? Well, the standard of review for the JMAL is de novo, and the Court asked whether there was substantial evidence to support the jury's award. We believe there was. Is that conditioned in your mind on the disallowance of the expert testimony? No, it's not, Your Honor. You mean you think there's substantial evidence even once the expert testimony is removed? Absolutely, Your Honor. First of all, the underlying facts and documents behind Dr. Stewart's testimony are not stricken. But beyond that, we don't even need that. We have Dr. Wallace's testimony. Wait, the underlying facts behind his testimony? Well, his opinion, but a document that was admitted, duly admitted into evidence, as opposed to his opinion, and in which other witnesses are cross-examined, that's part of the record, Your Honor. All right, go ahead. All right. Now, Dr. Wallace, let me make this final point, Your Honor. The critical error that ramifies throughout the trial court's opinion is that the trial court presumed that the jury was required to use hypothetical processor revenues as the royalty base, when, in fact, Dr. Wallace gave three different estimates of processor revenue, all widely divergent. And they were estimates because he only had data for three of the eight generations of processors. And for one of those estimates, he relied on the CPU module revenue because that's what customers selected and purchased when they bought a server. They had a choice between the in-order CPU module, that was the 7,000. They had a choice between the 8,000 CPU module. And time and time again, they selected the 8,000 and purchased it. And nothing replaced that, not even the Itanium. So that's your answer for why the demand for the patented invention was necessarily included in the space? My answer is twofold, Your Honor. We don't know whether the jury applied the entire market value rule. Irrespective of whether they did or not, we believe we met the entire market value rule. For example, we produced evidence of a design sign-off kickoff memorandum, a meeting by HP's marketing technical and other people in which they recognized that out-of-order execution, our invention was a competitive necessity. And that was then confirmed in the market by HP's marketing and business materials, including its own sales data, which showed that the 8,000 rapidly replaced the 7,000 and nothing was replaced by it, Your Honor. But the percentage increase declined in sales. At the end, Your Honor, I think of the period that may have been the case. But also, we produced precisely the kind of evidence that this course recognized in Fonar and other cases. But this is a different product than Fonar. I mean, an MRI, the purpose of an MRI is the image. And so I'm not sure you can apply that case to this. The CPU module, Your Honor, consisted of three components. The processor, the heat sink, and the power assembly. The latter two components were only there to support the CPU module. I'm not sure the improved performance is the equivalent of what happened in Fonar. Well, Dr. Smith, Your Honor, may I respond? Yes, please. Our expert, Dr. Smith, analyzed the performance of computers with P8,000 processors versus the performance of computers with the P8,000 series. So out-of-order versus in-order, taking everything into account. And on the basis of that analysis, he concluded that there were substantial performance gains with the out-of-order execution and that those gains persisted. Okay, one other question, if I may. If you were selling that computer and that advanced performance to me, what statistic would you cite? What metric of performance would you cite to me? Benchmarks, Your Honor, benchmarks. And HP's own documents would say that robust dependency detection enabled out-of-order execution and was necessary for superior performance. Thank you. So you've run into your rebuttal time, which we'll restore. I did. And you went a little ahead. So why don't we give Mr. Alcock another six minutes? Sure, Your Honor. I have a total of then 15? Yes. Yes. If you need it, only if you need it. Very well, Your Honor. One comment, there was multiple questions concerning the specification disclosure with respect to claim construction. The questions would also be relevant to written description as well. The only two points I would make, and they are largely responsive to Judge Moore's questions, are the patent is quite clear that the instruction format is not sampled. The instruction format utilized by the present invention will be considered first. That's at the bottom of Column 2. No other instruction format is disclosed anywhere in the patent. And then the patent is quite clear that all of the fields are required. At Column 8, it says, it also requires, and the it in that sentence is the dispatch stack. What line are you on in Column 8? Line 13, Your Honor. And the it in that sentence, it takes a little looking, but it is the dispatch stack in the context of the instruction unit, which is the portion of the processor that issues instructions. It also requires the determination of Alpha S1, Alpha S2, and Beta D. Yes, but the answer to that, Mr. Kaploski, I think would say, is that this is all a preferred embodiment. It's the only embodiment. It's the only embodiment shown. There's no other embodiment shown. You track this back all the way through. There's no other embodiment shown. Now, how exactly would you define the function for the means plus function language? Do you accept the district court's definition of the function? Well, it's eliminating dependencies, but the claim itself says issuing instructions by detecting concurrencies. The means for detecting the existence of concurrencies. Right. Concurrencies are the absence of dependencies, zero dependencies, and that's why you have to have all three fields, because you don't know if you don't have any dependencies unless you use all three fields. You don't know if you don't have any Beta D dependencies unless you use that field. Now, I looked through the record, and I couldn't see any evidence that was put on regarding potential equivalence, because, of course, under 112.6, equivalence is part of literal infringement, and then there's always DOE for dispatch stack. Okay, you can shake your head now and explain to me why in a sec, but my question is if I were to agree with you that Beta D dependencies were required, wouldn't this require vacating and remanding for an opportunity for a court to make fact findings on equivalence? Because even under 112.6, the issue of equivalence is one of fact, not law. Well, Your Honor, the plaintiff chose not to present that evidence down below. Well, but they didn't have to, because claim construction was decided so early in the process. I don't think once claim construction is decided, you ought to be held accountable for not presenting evidence of the claim construction the district court rejected. I mean, do you? Well, Your Honor, typically what you would do is under a circumstance like this present claim construction on all alternative bases and have the court decide on all alternative bases. Yes, but this claim construction was very early in the process, though. I'm not talking about the subsequent judge's revalidation of the claim construction, but the original one done by the district court was very early in the process. I mean, I guess I'm a little hesitant to hold against them failure to introduce evidence of the claim construction that was no longer at issue in the case at that point. Well, Your Honor, I'll answer the question this way. None were presented. Okay. None were presented ever. Aneesha Breaman, what about the WWWAR distinction and the testimony of your Dr. Worley? That is, with all due respect to counsel, a red herring. The summary judgment was our products don't have a Beta D field. No evidence at trial contradicted, including Worley's testimony, that they had a Beta D field. So they had the ability to bring the best evidence they could at the summary judgment stage, and they didn't. Well, I thought there were two kinds following that one. WAW. Right. We call it WAW. But neither of them was evidence that they were detected or tracked by a Beta D field. I'm confused. I thought that there was an open issue of fact over whether the HP product Well, you're saying no, but There's no disputed issue of fact about whether or not they had a Beta D field, whether or not there's some stray testimony in Worley that they may detect one of the dependencies but not with a Beta D field. The summary judgment It seems to me that's exactly the kind of equivalence that I'm referring to, though, that may well be something the jury could, in fact, find, depending on what the evidence bore out. So I think that unless you have something you want to respond to that with, I mean, that's what's sort of jumping out at me as you're explaining it. Well, Your Honor, there was no alternative presented, no equivalent presented. I'm not sure there is an equivalent available to be presented. So on damages, let me answer the questions the Court had, and then I'll move on to the more fulsome discussion I had. One is that there was never any argument, testimony by anyone that rate and base were linked in any way, none. There wasn't in the jury instructions, there wasn't by my argument in closing, there wasn't by counsel's argument in closing. So there was no evidence linking them. There was no testimony linking them. Mr. Wallace So not in the jury instructions and also not in the argument and you were there. Correct. And no testimony. Mr. Wallace did not testify to adjust the rate in order to account for apportionment. He adjusted the base according to apportionment. Even the base of the processor was adjusted according to apportionment because the processor had many other elements in it other than the alleged infringing device. And so even the processor base had to be adjusted. But there's some language, at least in our recent Lucent case, that talks about not at the end the linkage between rates and bases. Right. And my point is it wasn't done here. I mean, here the opposite is done. And that brings me to the second, well, let me answer the second question that was asked, I believe by Judge Prost. The two grounds are independent. The JMOL ground, the standard is as articulated. The second ground is the exclusion of the expert order, and that is on an abuse of discretion standard. And when you take out that evidence, there is no evidence justifying the use of a $23 billion base. So when you take out the opinion evidence, what about the underlying facts that supported the opinion? Well, you probably referred to documents. Well, there was evidence that there was a base of bricks of $23 billion. But all the evidence, if you take out their expert, is that that isn't one that would be used. So the only evidence at trial, if you take Stewart's evidence out, is that there's a server base, don't use that. There's a brick base, don't use that. There's a processor base, that's even too big. But that's the one that's closest, and that's all the evidence there is at the trial, if you take his testimony out. Well, let me ask you about taking out his testimony. It seems to me your argument as to why the testimony should be excluded, it seems to me boils down to the fact that the patented invention drove consumer demand was shaky. If it's a question of whether or not the evidence is shaky, why doesn't that go to a jury? Why isn't the relevance and reliability of what the testimony was something that's left to the jury as opposed to striking the expertise? Well, because the evidence was so far away from the minimum standard to satisfy reliability under Dalbert or to satisfy the JMLL standard that it was excluded. I mean, remember, what we have here is servers the size of a Viking refrigerator. They have thousands of components in them. It is admitted that that base was properly excluded. Judge Rader excluded that as a base, and they're not even contesting that. They didn't even contest it at trial. They came back then with this brick, which goes into the server. It is admitted that the market for the brick is the same as the market for the server. So things like HP's Global Reach, all the other technology in one of these Viking-sized refrigerators, all the software that goes in there, all the other components, that is what sells those things, not the speed of a processor that's in it. Let me take you back to Lucent, because it seems to me, I mean, I want to get your imperonada on what the correct read of Lucent is. Certainly they have strong language talking about the entire market value and sort of triggers in order to meet that. But that's followed then by a discussion about rates and bases. They even cite the Kearns case. Well, nobody buys a car because of the windshield wipers. But indeed, they cite that case as one in which, in order to account for that, you just revise the rate. Why isn't that something that arguably was done here? Because that isn't what was done here. The jury decided an issue. By deciding the $23 billion base, they decided apportionment wasn't necessary. They were instructed, to decide on amount, you must first decide the appropriate royalty base. A base generally includes only revenue generated by the infringing component. That is, where a patent creates only part of a larger product, damages are generally moved to the value created by the patent. Cornell has the burden of establishing that it is entitled to obtain damages based on both patented and unpatented components. They were then told... No, what I'm suggesting is, can't the royalty rate be used to adjust a broad base? It can theoretically, Your Honor, but it wasn't here. Because the very next point the jury was told is whether the specific features covered in the 115 patent were the basis for consumer demand for the product. So they were said, decide that question, and if you decide that, yes, you can include unpatented components in the base. We know absolutely for sure that they answered that question yes, because they had a choice between an $8 billion base that didn't include as many unpatented components and the $23 billion base that they did. They chose the $23 billion base. So we know there's no question that the jury determined this issue adversely to HP, and as I said a moment ago, there's also no question that the evidence is insufficient to support it, because Judge Rader said there isn't enough evidence to support using the entire server base, and they concede that for market purposes the brick base, the one that was used, is the same as the server base, and that's because it is. Was there an element of sanction in striking the expert? I was surprised that the expert set a trial. I characterize that as a minimum appropriate royalty base. Was there an element of sanction in striking his testimony? Well, what Judge Rader said, what he ordered to do is he said, look, you can't use the server base. They came in with the brick base. He said, okay, I'll let you put that evidence on, but you've got to subtract out the value of the unpacted components. Was it necessary to put that evidence on to preserve his credibility for what he said before the Dahlberg hearing? It was necessary to put that evidence on to comply with Judge Rader's order, and to comply with the law, because even the $23 billion base included many, many, many unpacted components, even as did the $8 billion base. And so I don't know whether it was an element of sanction or if it was just a clear requirement of the law, and that, Your Honor, we're turning back to finally loosen, is that's why this case isn't loosened. It would have been loosened if someone instructed them, okay, you can take into account the unpacted components in the royalty rate. Here, they didn't do that. They didn't even take into account the unpacted components in the $23 billion base. They maintained the 2.5% rate that they had always said, even as to the server base. So there was no adjustment in the rate. But the jury made the adjustment. They picked 0.8% rate. Well, they determined the royalty rate based upon the evidence and instructions that they were given. And if you look at the instructions, it says in determining the reasonable royalty rate, this is the next series of instructions, it listed a number of factors. And they came out at lower than 1%. But there was evidence for them to come out lower than 1% totally independent of the apportionment issues. I mean, Stuart was cross-examined pretty harshly on that 2.5% rate. And I think it was viewed as unsupported by the base calculation, by the database that he used. And then our expert testified in 36 years of patent licensing, he'd never seen a license in this computer field for a single patent at 1% or over. So there was plenty of evidence, Your Honor. Repeat that last, he's never seen... Not in this technology, not in the computer business. Usually the rate is a maximum of 1% for a patent. But this is a pretty extraordinary patent. Cited in the top five among all similar patents. Well, my only point here, Your Honor, is that there was plenty of evidence for the jury to consider to come up with a 0.8% rate independent of the evidence concerning apportionment. And we know for sure that they determined that apportionment was not proper because they chose the $23 billion base. The only way they could have got to that base is by finding the entire market value rule present. That's what the instructions... But Schrader didn't prevent the entire market value rule because even claiming the processors is a violation of the entire market value rule. Right. So there's no problem with the jury finding the entire market value rule as proper. I guess I'm having trouble understanding why the evidence of the HP representative who said, let me have my quote here, something to the effect of to catch the eye of potential purchasers of HP servers, why isn't that alone some evidence that would establish a basis for customer demand? It's some evidence, but it's not sufficient evidence in light of the two levels. The level of discussion of that evidence that you just recited, Your Honor, is at the processor level. The processor has to be fast. The evidence was there were four or five reasons why the processor was fast. One of them was the patent invention and there were five or six others. That's the testimony that you're quoting. That's the damage base, the $8 billion damage base. That's just fine. But that doesn't justify the $23 billion base of the brick and the server. What's the difference between the CPU brick and the processor? Nothing. The processor is the CPU. Seriously, what else is there? What else is inside that box? Oh, there's a heat sink. So is there something unique about the heat sink in this case that makes it the basis of the customer demand? There's five patents on it. You can't find a piece of technology in a computer that doesn't have a patent on it. Right, but the point here, Your Honor, is the brick and the server are the same market. There's no dispute about that. Why didn't they get the server market? You're actually fighting against yourself right now, in my mind. Because Judge Rader ruled correctly... Well, that's what we're trying to decide. Well, Judge Rader ruled correctly that the single, you know, tiny piece of the IRV in the processor did not drive customer demand for a million-dollar unit that had hundreds of other patented technologies involved in it and was sold because of HP's name, reliability, and many, many other factors. And that, Your Honor... Is there evidence in the record that people chose to buy this because of HP's name and all of that? It has nothing to do with the... Where exactly is the evidence that people bought this because of HP's name and not because of the out-of-order instructions? There were multiple witnesses on that subject. Multiple witnesses. The jury had the server... The judge had the server in front of him and the witness walked down and showed all these components. So, I mean, it truly... But the witness showed the components. But what is the evidence regarding the basis for the customer's demand? He was one of the salespeople for the unit and he said this is why all of these are the reasons why the customers buy it. The testimony was they didn't even know what out-of-order was. He never had any comments or questions about it. So, just to finish, Your Honor, I'm out of time. It clearly is an abuse of discretion standard and the trial judge was in the perfect... What's an abuse of discretion standard? I'm sorry to indulge, but... What's an abuse of discretion standard? Well, I thought this part of the discussion related to the ruling on excluding the expert. And that is an abuse of discretion standard under Dalbert. And so the gatekeeper function issue was clearly an abuse of discretion standard. Okay, thank you. Thank you. Well, you exceeded your time by three minutes, so we'll add three minutes to the five minutes you had before, giving you a total of eight. Can I have three minutes as well? Well, we restored your five minutes of rebuttal and we compensated the other side, so now you've got a total of seven minutes. Understood. Thank you. Your Honor, let me turn back again to damages, if I may, and take up some of the points that Mr. Alcock made. First of all, HP's damages expert, Mr. Wallace, testified that rate and base were intertwined and he did that at J.A. 7099 in the record. Secondly, the instructions make crystal clear that the jury did not have to conclude that the entire market value rule was met in order to use the $23 billion CPU module as the royalty base. Why does that matter? Why are you worried about whether or not the jury concluded that on the $23 billion? I don't understand the relevance in your mind. Yes, Your Honor. It matters because we don't know whether the jury applied the entire market value rule. We know two things. We know the base that they chose and we know the rate that they chose. Well, where else does the $23 billion come from? The $23 billion is simply the CPU module revenues. Right, and if they're using that as a base and it's clear they chose that as a base, is there any evidence that they could have done anything different than choose the CPU module as the starting point for the determination of the damage amount? We think the substantial evidence is that the only reliable royalty base to use was the CPU module because in part of the three different divergent estimates... Well, that's not the only reliable one. You wanted the server one, too. Well, maybe for another day. Now, if I may just take the Court to the instructions. At JA7309, the instruction says, in determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. It doesn't say, as HP's counsel indicated, rate. And then it goes on to list some of the factors that the jury should consider, including the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements. That's at JA7310. And there's other factors, too, such as the extent to which the infringer has made use of the invention. So the jury is being told here that they can do an apportionment of the value of the invention by adjusting the rate. And the rate and the base are intertwined. And if we look at what Mr. Wallace did, it provides support for that. He took the $23 billion royalty base as one of his computations. He multiplied it by an 8% royalty rate. You mean the 0.8%? 8%, Your Honor. He multiplied it by 8%. And then he adjusted that rate by multiplying it by a so-called cost adjustment factor, which in the case of the CPU module was the IRB cost of manufacture, which was an estimate, divided by the cost of manufacturing module. And he came up with $7.7 million. Now, the jury, there's substantial evidence to support this, could well have said, you know what, the only reliable base is the $23 billion. We understand that Mr. Wallace is making this adjustment to the 8% of this cost factor. We're going to pick a tenth of that to capture the value of the invention that's in the module. And that was also supported by Mr. Ostendorf's testimony in at least two respects. Number one, he said that an important patent on a component of a computer can get you 1%. And then he said, as to the Wang patents, which in fact had been litigated valid and infringed, and that's what you assume after all, and what the calculation we're talking about here, you got 3% to 4% on memory modules. We also had evidence in the record from HP that there were HP licenses which paid up to a 7% or 8% royalty rate on end products, end computer products sold by HP. Maybe, tell me where my characterization goes wrong here. I guess we have, the jury was presented with certain figures that would imply use of the, not imply, but would use entire market value and come out with a number, which is the number that they in fact adopted. But you would like us to surmise that they could have potentially used an alternative route that isn't problematic under Judge Rader's analysis and have come up with the same number. Is that, am I understanding that? Is that what you're articulating? Our position is that there were two separate and sufficient ways that this verdict is sustainable under substantial evidence. One is by doing an apportionment in a rate to arrive at the value as the instructions permitted, and number two is concluding that the entire market value rule was met. Now, let me, I want to make a quick point if I may on the standard of review. Judge Rader, of course, alternatively granted HP a remittitor. And that, of course, is reviewable for abuse of discretion. Now the important point here is that Judge Rader granted remittitor on the same basis upon which he determined that JMAL was appropriate. And that's apparent at J705 of the record. Namely, that the jury should have used the processor, hypothetical processor module revenue. Now if I may turn very quickly back to the patent. I'd like to give Your Honor one more citation, if I may. What is, is this in reference to damages, counsel? No, Your Honor. No. We're isolated. Thank you. I think that's all I have. Thank you. Appreciate the argument of both counsels. The case is submitted.